IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT REEVES,
        Plaintiff

v.

WEXFORD HEALTH SOURCES, INC., et al.,
        Defendants

Case No. 3:14-cv-160-KRG-KAP

## Order and Report and Recommendation

### Recommendation

Defendants have filed a motion at docket no. 35 to dismiss plaintiff's complaint, to which plaintiff has responded. I recommend the motion to dismiss be denied as explained below; I also issue a discovery schedule.

### Report

Robert Reeves is an inmate in the Pennsylvania prison system. In late 2012 and into 2013 Reeves suffered from an injury to his left thigh that was initially diagnosed as a hematoma from an injury in November 2012 on some exercise equipment. In October 2013, the still unresolved injury was diagnosed as a sarcoma, and several months later diagnostic tests in March 2014 indicated that the tumor had metastasized. Reeves alleges in Count I that the delay by the three defendants, Doctor Robinson, Doctor Kephart, and Doctor Salameh in making the proper diagnosis and therefore providing the proper treatment has injured him both by leaving the sarcoma untreated and by causing the elevated risk of metastasis; this allegedly violated the Eighth Amendment. In Count II Reeves asserts claims under Pennsylvania state law against Doctor

Robinson, Doctor Kephart, and Doctor Salameh, and against Wexford Health Sources, Inc. as their employer, for their alleged negligence in failing to provide a prompt diagnosis and proper treatment of Reeves' condition.

It is necessary to appreciate that this matter is at the pleading stage, not summary judgment. This matter lies at the fuzzy border between deliberate indifference and medical negligence. The Supreme Court has stated that for an inmate to state a claim against prison officials under the Eighth Amendment for an injury caused by medical treatment or the lack thereof, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). After decades of lower court precedent, the Supreme Court formally defined deliberate indifference as the state of mind that a prison official has when he (or she):

knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. 825, 837 (1994). Negligence, by contrast, imposes liability for actions that fail to come within the generally accepted standards of professional conduct. See Grossman v Barke, 868 A.2d 561 (Pa.Super.), allocatur denied, 889 A.2d 89 (Pa.2005). An oxymoron, "deliberate" "indifference" straddles the border from acts and omissions taken with intent to

cause harm to those taken with a reckless disregard for the possibility that harm will occur. Confusion sets in with this already difficult job of line drawing because conscious human actions connote intent - one does not think or say "it happened that food was consumed by me", one thinks and says "I ate" - and because acts are intentional there is an unconscious spillover into evaluating the mental state of the actor. Phrased another way, each volitional act has both a "what" and a "what were you thinking" component, and to classify that act as intentional, negligent, or deliberately indifferent is to evaluate the "what were you thinking" element. Thus "I ate a piece of chocolate cake" may be negligent, if I took the cake from the dinner table not asking whether it was baked to take to the family reunion tomorrow; it would be intentional if I took it out of the office refrigerator knowing that it belonged to someone else; if I took the cake out of the office refrigerator without asking and on the self-serving assumption that it had been brought in as a general snack, that would be deliberately indifferent. My shooting at an archery range may be negligent if, having failed to take care that the previous flight of archers had all returned from downrange, I hit someone who had stepped out of sight behind an archery butt; it would be intentional if I saw someone step behind the butt and shot just to scare him; if I stepped up to the line and let fly without making any inquiry whether the range was clear for use, that would be

3

deliberately indifferent. Compare Davidson v. Cannon, 474 U.S. 344 (1986)(failure by prison official to follow up on a complaint of a threat to plaintiff of an assault by another inmate in the mistaken belief that the matter was not urgent because the complaint was sent indirectly, unlike previous complaints from plaintiff, is not deliberate indifference)[1]; with Haley v. Gross, 86 F.3d 630, 642 (7th Cir.1996)(corrections officer's failure to respond to the risk of injury to plaintiff from his cellmate in a cell known to be off the general locking system ("deadlocked") as a result of the cellmate's actions, when inmate was acting "like he was crazy" and openly threatening to set cell on fire, supported a deliberate indifference claim).

In Estelle v. Gamble, 429 U.S. 97, 104 n.10 (1976), the Court gave three useful (and one useless) examples of deliberate indifference in medical treatment of inmates: the first, on the border between negligence and deliberate indifference, was that of a doctor choosing the "easier and less efficacious treatment" of throwing away the ear of prisoner injured in an altercation and stitching the stump rather than trying to save the ear; the second, on the border between deliberate indifference and intent, was that of a doctor injecting a prisoner with penicillin despite knowledge

---

1. Plaintiff's response to the motion to dismiss mistakenly cites the dissent in Davidson v Cannon, 474 U.S. at 357, and that perfectly illustrates the frequent confusion of negligence with deliberate indifference.

4

that the prisoner was allergic to penicillin; the third, in the heart of deliberate indifference, was that of a prison doctor who discharged an inmate the day after his return from the hospital and thereby required him to stand and walk without first checking with the outside surgeons who had operated on an inmate's leg whether the inmate could stand without injury. Reeves' complaint asserts the <u>Estelle</u> footnote's third mode of liability against defendants Robinson, and Kephart, with the first mode of liability laid against Salameh.

A more recent nonprecedential but useful analysis of deliberate indifference in inmate medical treatment is <u>Williams v. Kort</u>, 223 Fed.Appx. 95 (3d Cir.2007). Williams alleged that he injured his knee in June and August 2000 while an inmate at S.C.I. Coal Township, but despite his complaints of pain and objective signs of injury such as swelling and buckling of the knee the treating physician, defendant Doctor Kort, refused to order an MRI and treated Williams only with pain relievers after x-rays were taken and showed there were no broken bones. Upon transfer to S.C.I. Somerset in August 2001, personnel at Somerset cancelled Williams' pain medication and continued to deny him an MRI, allegedly without examining his knee and despite his description of his symptoms. It was not until June 2002, after a transfer to S.C.I. Albion, that Williams received an MRI which revealed that he had a bilateral meniscus tear requiring surgery. Although

5

affirming summary judgment for Kort, the panel observed that a sufficient allegation of deliberate indifference claim had been stated against Kort, because Kort allegedly knew of plaintiff's injury through his continued treatment of Williams and said he would order an MRI if the injury did not improve and did not do so. 223 Fed.Appx. at 100. Similarly, the appellate panel observed that deliberate indifference claims had been stated against defendant Lorah, a treating physician's assistant at Coal Township, and defendant Ohler, a treating physician's assistant at Somerset, based on allegations that Lorah and Ohler "insisted on courses of treatment they knew were ineffective." 223 Fed.Appx. at 101. Persisting in treatment known to be ineffective is the essence of Estelle v. Gamble.

Here, the complaint alleges that at the Somerset Hospital in January 2013, Doctor Go, noting Reeves' own account that described the injury to his left thigh as a trauma from being pinched on a piece of exercise equipment, diagnosed Reeves with a hematoma, but recommended a reassessment in 7 to 10 days. When Reeves returned to S.C.I. Somerset from the Somerset Hospital, defendant Doctor Robinson noted Reeves' elevated temperature, but described Reeves' thigh injury as "resolving with the application of heat." Complaint ¶37. Reeves continued to be seen by non-defendant medical personnel at S.C.I. Laurel Highlands, including a Doctor Mullen who had also ordered that Reeves be re-evaluated

on February 7, 2013, to determine whether there was a need for Doctor Go to assess the need for surgical intervention. Complaint ¶36.

Doctor Robinson "unilaterally" canceled the consultation with Doctor Go that Doctor Mullen had ordered despite "no objective findings of improvement of the mass." Complaint ¶38. In January and February 2013, a Doctor Ali described the mass as an "abscess versus hematoma," prescribed antibiotics, noted that Reeves was persistently running a temperature and should have a "work up" to determine the cause if it persisted, and cleared Reeves to be transferred back to his home prison, S.C.I. Albion; Ali did not prescribe surgery. Complaint ¶¶45-48, 56-57. Reeves saw Doctor Robinson again in February 2013, and allegedly the doctor incorrectly again characterized the hematoma as "resolving." Complaint ¶63.

In March 2013, Doctor Kephart evaluated Reeves for physical therapy and diagnosed the thigh injury as "likely calcific deposits to area of healing hematoma." Complaint ¶67. Doctor Kephart approved Reeves' use of a hot water bottle for six months. Complaint ¶72. When Doctor Kephart saw Reeves again in April 2013, he noted Reeves' mass "persisted." Complaint ¶75. On August 9, 2013, Doctor Kephart noted that an x-ray of Reeves' leg appeared "to be abnormal" and ordered an ultrasound, with the next step to be an MRI or biopsy to "rule out intramuscular sarcoma." Complaint

¶¶80-83. Doctor Salameh reviewed this request and then Doctor Kephart discontinued his order in favor of an consultation with Doctor Malhotra, an oncologist, in September 2013. There is an implicit allegation that this was done solely because the consultation was cheaper than an MRI and biopsy; it is not clear here at Complaint ¶¶84-85 whether Doctor Robinson or Doctor Salameh, or both of them jointly, made this decision but Complaint ¶87 indicates that it was Doctor Salameh.

In September 2013, Reeves, who had on occasion had been noted as expressing the belief that his symptoms were lessening, experienced sharp pain in his left thigh; he was noted by Nurse Holland to be running a temperature for several days. After Doctor Malhotra's consultation, Malhotra recommended that Doctor Go see Reeves for a biopsy on what Go described as a mass that was growing and was "suspicious for rhabdomyosarcoma." Complaint ¶¶93-95. A Doctor Hursh evaluated an MRI of Reeves's femur on October 8, 2013, and believed the mass could be a sarcoma; Doctor Go gave the same opinion after surgery on October 16, 2013, as did Doctor Mittal, a pathologist, after examining the biopsied tissue on October 17, 2013. Complaint ¶¶96-99.

After the surgery (although it is described as a biopsy it appears to possibly have been excision of the tumor) there were follow-up efforts: a Physician Assistant Reisinger referred Reeves to a cancer center in October 2013, and in November 2013 scheduled

Reeves for a CT scan to determine whether there was any recurrence of the tumor or metastasis. The CT scan was allegedly not performed. In February 2014 Doctor Malhotra recommended an MRI to monitor Reeves for recurrence, with radiation therapy to follow if indicated. Complaint ¶116. In March 2014, Reeves had an MRI of his left femur and a CT scan of his chest, abdomen, and pelvis. A Doctor Trecha believed from the results that Reeves might have had a metastasis of his cancer, a belief confirmed by tests later in 2014. Complaint ¶¶117-18, 120-21.

The foregoing allegations, plus the allegation that each doctor "knew" of Reeves' medical history and symptoms throughout 2013, Complaint ¶126, state an adequate claim of deliberate indifference (and *a fortiori* negligence) against each of the doctor defendants. At the pleading stage, this matter is legally the same as Williams v. Kort. Reeves' complaint amounts to the assertion that all three doctors persisted with ineffectual treatment of his sarcoma not only long after it was reasonable to conclude that this was not a hematoma, but even after the point that failure to seek more thorough diagnosis of Reeves' condition must have been taken in the knowledge that it risked leaving a cancerous tumor growing in his leg. A trier of fact may infer knowledge from the obvious, Farmer v Brennan, 511 U.S. at 844, and at this stage of the proceedings I must accept Reeves' claim that the inadequacy of his

treatment was at some point in 2013 so obvious as to be known to the defendants.

This is not to say that, even accepting the complaint at face value, a claim can be made that every phase of Reeves' treatment suffered from deliberate indifference by all three defendant doctors. For example, standing alone Doctor Robinson's alleged cancellation of a consultation in early 2013 would not constitute a sufficient claim of deliberate indifference. Also, as can be seen, each of the doctor defendants is alleged to be primarily responsible for a different segment of the alleged lapse in care: Robinson initially, Kephart subsequently, and Salameh as the moving force in the cancellation of the MRI in August 2013. There are many questions raised and not resolved by the pleadings that will be of obvious importance, such as the reasonableness of the defendant doctor's actual reliance on their own observations, the nature of any information provided by other medical personnel, particularly Doctor Mullen and Doctor Ali, and the input of Reeves himself, particularly between April 2013 and August 2013. Neither plaintiff not defendants attempt to parse the complaint that closely, and since something survives against each defendant there is no call for me to do so at this stage.

Another unknown that will be important to the disposition of this matter is the rarity of the sarcoma suffered by Reeves, as well as its similarity in appearance to a hematoma: the maxim "when

10

you hear hoofbeats, think horses not zebras" certainly applies to mean that the initial diagnosis of hematoma and treatment were likely not even negligent. Also, although a doctor cannot cancel treatment simply because it is expensive, it is certainly not impermissible for Doctor Salameh to weigh the cost of treatment against its likely benefits under the circumstances known to him, because Farmer v Brennan, 511 U.S. at 844, also instructs:

> [I]t remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety. That a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so. Prison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent. In addition, **prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.** (my emphasis)

In short, with the foregoing caveats, at this stage the deliberate indifference claim should go forward. Because the Supreme Court's precedent effectively makes negligence a "lesser included offense" of deliberate indifference, so must the negligence claim.

The following discovery schedule is ordered:

1. Any dispositive motions (motions for summary judgment) shall be filed with a memorandum in support and responded to by the opposing party within twenty days. Discovery motions, if not resolvable by phone conference, may be supported by a letter brief

no more than two pages in length and opposed by a letter brief no more than two pages long filed within five days thereafter. Absent order to the contrary, the filing of discovery motions shall not stay discovery or extend the time for the filing of pretrial statements.

2. Any discovery requests shall be propounded on or before September 30, 2015, and completed by October 31, 2015.

3. Any motions for summary judgment shall be filed on or before November 30, 2015.

The filing of pretrial statements shall be scheduled after any motions for summary judgment have been decided.

Pursuant to 28 U.S.C.§ 636(b)(1), the parties are given notice that they have fourteen days to serve and file written objections to the recommendation contained herein.

DATE: 15 January 2015

Keith A. Pesto,
United States Magistrate Judge

Notice to counsel of record by ECF